1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

WILLIAM HOWARD,

Plaintiff,

v.

CONTRA COSTA COUNTY; DAVID
LIVINGSTON; SEAN FAWELL; TOWN
OF DANVILLE; STEVEN SIMPKINS; and
DOES 1-50,

Defendants.

Case No. 13-cv-03626 NC

**ORDER ON DEFENDANTS'
MOTION TO DISMISS**

Re: Dkt. No. 12

Plaintiff William Howard reported misconduct of a fellow deputy to the Contra Costa County Sheriff's Office.  The report resulted in the arrest of the deputy who was criminally prosecuted for his involvement in setting up "Dirty DUI's."  After reporting the misconduct, Howard was ostracized, harassed, and ultimately fired by the County.  Howard then brought this lawsuit against Contra Costa County, the Town of Danville, and their employees, alleging violations of his rights to free speech and due process, retaliation in violation of California Labor Code § 1102.5(b), and state law claims for negligent supervision and intentional infliction of emotional distress.  For the reasons set forth below, the Court DENIES defendants' motion to dismiss Howard's claims for retaliation in violation of the First Amendment and California Labor Code § 1102.5(b), and GRANTS the motion to dismiss WITH LEAVE TO AMEND as to the remaining claims.

# I. BACKGROUND

## A.    The Allegations of the Complaint

### 1.    Howard Is Assigned as Deputy Tanabe's Cover Officer.

Plaintiff William Howard was employed by the County Sheriff's Office as a Level II Reserve Deputy.  Dkt. No. 1 ¶ 16.  As a Level II Reserve Deputy, Howard could perform general law enforcement assignments while under the immediate supervision of a peace officer who had completed the Regular Basic Course.  *Id.*  In January 2009, Howard began working as a per diem deputy for Marine Patrol, a division of the County Sheriff's Office.  *Id.*

Despite his assignment to Marine Patrol, on January 14, 2011, Howard was assigned as the cover officer for Deputy Stephen Tanabe, a police officer employed by the County, on a shift to take place from 6:00 p.m. to 4:00 a.m. on January 15, 2011 in Danville.  *Id.* ¶¶ 17, 19.  During this shift, Deputy Tanabe received numerous phone calls from someone whom Deputy Tanabe identified as being his "P.I. friend."  *Id.* ¶ 19.  During the phone calls, Howard surmised that Deputy Tanabe was receiving information about a possible suspect under the influence of alcohol from the "P.I. friend."  *Id.*

Deputy Tanabe drove the patrol vehicle adjacent to a wine bar known as the Vine.  *Id.* ¶ 20.  Howard and Deputy Tanabe observed an individual, later identified as Mitchell Katz, leaving the Vine in a truck.  *Id.*  Deputy Tanabe pulled his patrol vehicle behind Katz's truck and followed Katz for a short distance.  *Id.*  Deputy Tanabe stopped Katz for a traffic violation and arrested him for driving under the influence of alcohol.  *Id.*  Deputy Tanabe processed Katz at the Danville Police Station, and Katz was then transported to the Martinez Detention Facility by another deputy.  *Id.*

### 2.    Deputy Tanabe Comes to Howard's House.

On February 16, 2011, Deputy Tanabe called Howard asking if he could visit Howard at his home.  Dkt. No. 1 ¶ 21.  When Deputy Tanabe stopped by Howard's home around 8:00 p.m. that evening, Howard perceived that Deputy Tanabe was in a highly disturbed and agitated state.  *Id.*  Deputy Tanabe informed Howard that Christopher Butler and the County

Narcotics Enforcement Team Assistant Sheriff had been arrested by the State of California Department of Justice. *Id.* Deputy Tanabe told Howard for the first time that his "P.I. friend" was Butler. *Id.* Deputy Tanabe said that the police were going to start an investigation into Deputy Tanabe's involvement with Butler. *Id.* Deputy Tanabe expected the police would search his home and expressed concern about an item he possessed that the police would find. *Id.* Deputy Tanabe asked Howard if he could leave something at Howard's home until things settled down. *Id.*

Deputy Tanabe went out to his vehicle, retrieved an item covered with a black plastic garbage bag and asked Howard to place the item in his attic. *Id.* ¶ 22. Howard felt very uncomfortable with what Deputy Tanabe was asking him to do, but to avoid a confrontation with Deputy Tanabe while he was in his highly disturbed and agitated state, Howard took the item. *Id.* Howard also needed time to process the information Deputy Tanabe provided him and to determine what course of action to take. *Id.* Howard did not look in the bag and did not know what the bag contained. *Id.*

### 3.   Howard Reports Deputy Tanabe's Conduct.

On February 17, 2011, Howard decided he had to report the events around Katz's arrest the night of January 14, 2011, and Deputy Tanabe's request to leave a black plastic garbage bag containing an unidentified item at Howard's home. Dkt. No. 1 ¶ 23. Howard decided that he would report these incidents to Lieutenant George Wright of Marine Patrol (Howard's commanding officer at the County Sheriff's Office) after the holiday weekend. *Id.*

On February 23, 2011, Howard reported Deputy Tanabe's conduct to Lieutenant Wright. *Id.* ¶ 24. Howard was not on duty nor in uniform when he made this report to Lieutenant Wright. *Id.* Howard spent several hours reviewing the details of Deputy Tanabe's conduct on January 14 and February 16, 2011, with Lieutenant Wright. *Id.* Lieutenant Wright asked Howard to provide a verbal statement. *Id.* After Howard completed his statement, Lieutenant Wright instructed him to report to Assistant Sheriff Pascoe at the Field Offices Bureau in Martinez, California. *Id.* Howard was further

informed that he would not be working for the County Sheriff's Office that day. *Id.*

When Howard arrived at the Field Offices Bureau, Assistant Sheriff Pascoe turned Howard over to Sergeant Paul Beard and Sergeant Jason Vorhauer. *Id.* ¶ 25. Howard was then interviewed again regarding Deputy Tanabe's conduct. *Id.* Sergeant Vorhauer stated to Howard at the beginning of the interview that he was being treated as a civilian and not as an employee. *Id.* After the interview, Sergeant Beard and Sergeant Vorhauer followed Howard to his home to collect the unidentified item in the garbage bag and opened the package in his presence. *Id.* ¶ 26.

### 4.  Howard Experiences Retaliatory Conduct for Reporting Deputy Tanabe.

On March 4, 2011, Deputy Tanabe was arrested and his house was searched based on an affidavit prepared by Sergeant Vorhauer. Dkt. No. 1 ¶ 27. On March 9, 2011, Howard was named in a news article on page one in a newspaper published by the San Francisco Chronicle regarding Deputy Tanabe and the "dirty DUI's." *Id.* ¶ 28. "Dirty DUI's" was a term used by Deputy Tanabe and Butler to describe Butler hiring co-conspirators to assist in determining if a "target" male, usually the husband of his female client, would drink alcohol in a quantity sufficient to exceed the legal limit to drive an automobile. *Id.* Once the "target" male had been observed to consume this amount of alcohol likely to exceed the legal limit to drive, Butler would tip off Deputy Tanabe. *Id.* Deputy Tanabe would arrest the "target" for driving under the influence and Butler would compensate Deputy Tanabe. *Id.* This is what occurred the night of the Katz arrest. *Id.* In the media reports, Howard was identified as the person who reported Deputy Tanabe to the County regarding the Katz arrest. *Id.* Numerous other news articles and television news broadcasts regarding the "dirty DUI's" and identifying Howard by name followed over the next several weeks. *Id.* During that period of time, Howard's peers continued to talk about Deputy Tanabe's arrest of Katz and Howard reporting Deputy Tanabe for the alleged "dirty DUI's." *Id.* ¶ 29. Howard's peers criticized him for trying to ruin the career of a respected and well-liked sheriff deputy. *Id.* Howard was told he could not talk to anyone about Deputy Tanabe and the arrest of Katz, so Howard was not able to explain to his peers the truth about what

actually happened. *Id.*

On April 13, 2011, Howard received a telephone call from Sergeant Roxane Gruenheid of Volunteer Services at the County Sheriff's Office telling him that they had received a sealed envelope from the Law Offices of James McGrail. *Id.* ¶ 30. Howard asked Sergeant Gruenheid to forward the envelope to him and told her that depending on the contents, he may need guidance with the situation. *Id.* On April 16, 2011, Howard received the envelope that Sergeant Gruenheid had forwarded. *Id.* Enclosed in the envelope was a subpoena for Howard to attend Katz's DMV hearing. *Id.* Howard emailed Sergeant Gruenheid with his concerns of having to provide a sworn statement that might adversely affect the criminal investigation surrounding Deputy Tanabe and the arrest of Katz. *Id.* Sergeant Gruenheid responded that as far as she was concerned, Howard was "on [his] own." *Id.* On April 20, 2011, Howard also received an email from Lieutenant Dan Hoffman advising Howard that he would not be receiving legal advice from anyone in Volunteer Services. *Id.* Howard felt isolated from the County Sheriff's Office. *Id.*

On April 30, 2011, Howard was advised by the County Sheriff's Office that he had been removed from the schedule for his shift that day. *Id.* ¶ 31. It was the first time that had ever happened in the eighteen years he had worked for the County Sheriff's Office. *Id.*

On May 8, 2011, Howard was scheduled to work a shift as the cover officer for Deputy Mike Berry. *Id.* ¶ 32. Deputy Berry arrived two hours late without making an attempt to notify Howard, was very hostile towards Howard, and sent Howard home two hours early. *Id.* Howard continued to feel isolated and ostracized from the County Sheriff's Office. *Id.*

On May 27, 2011, the Marine Patrol's work schedule was published for the week, and for the first time since Howard had begun working with the Marine Patrol, he had not been assigned a single day of work. *Id.* ¶ 33.

On June 22, 2011, Howard received a phone call from the office of the County Assistant Sheriff Sean Fawell advising Howard that Assistant Sheriff Fawell wanted to meet with him at 10:00 a.m. *Id.* ¶¶ 7, 34. Given the hostile treatment of the County

Sheriff's Office towards Howard, Howard asked what the purpose of the meeting was to determine whether he needed to have legal representation with him, and also stated that he would not attend the meeting until after he had consulted with an attorney. *Id.* Instead of a response, Lieutenant Hoffman was dispatched to Howard's home in full uniform and in a marked vehicle to escort Howard to the meeting. *Id.* When he got to Fawell's office, Howard was left standing outside the office for fifty minutes before Assistant Sheriff Fawell met with him. *Id.* Once inside the office, Assistant Sheriff Fawell advised Howard that the purpose of their meeting was to address his role in the Katz arrest. *Id.* Assistant Sheriff Fawell continued, stating, "if you were a regular, I would have fired your ass." *Id.* After several more statements similar to this, Assistant Sheriff Fawell advised Howard that he was no longer allowed to work in Marine Patrol and had been reassigned to "Civil." *Id.* It is Howard's understanding that Reserve Deputies are never assigned to the Civil division and that a reassignment to the Civil division was a demotion. *Id.* Assistant Sheriff Fawell then instructed Lieutenant Hoffman to take Howard to "Civil" before driving him home. *Id.*

Lieutenant Hoffman instead took Howard directly home, complaining that his work schedule had suffered because Howard had not driven himself, told Howard that people like him were not supposed to ask the Commander the purpose of a meeting, and stated, "I know Tanabe and I like him, and I don't know you at all." *Id.* ¶ 35.

On July 6, 2011, Howard began his assignment in the Civil division, but was not to report to work until July 12, 2011. *Id.* ¶ 36. On July 12, 2011, Howard was advised by the Lieutenant of the Civil division that Howard would not be paid per diem for his services in the Civil division as he had for his services in the Marine Patrol. *Id.* This was the first Howard was hearing of this, and at that point it became clear to him that he had received a demotion. *Id.*

On July 31, 2011, Howard and his wife worked the raffle at the Sheriff's Annual BBQ, which they had done for the fourteen years prior. *Id.* ¶ 37. While Howard was on the stage, just prior to the raffle beginning, Assistant Sheriff Fawell approached him and accused him of having a lack of team spirit and of having a borderline disrespectful

demeanor. *Id.* Assistant Sheriff Fawell then quizzed Howard about his assignment in the Civil division, and stated that he was "keeping an eye on" Howard. *Id.*

On August 11, 2011, Howard was advised by Volunteer Services that even though he had been transferred to the Civil division, he could still volunteer at Marine Patrol for special events when additional deputies were needed, but under no circumstances would he be permitted to receive per diem pay. *Id.* ¶ 38.

On August 17, 2011, Howard visited the Court Security division of the County Sheriff's Office to talk to a Sergeant Gregory who had told Howard when he left Court Security for Marine Patrol that if he ever wanted to return, he would be welcomed back. *Id.* ¶ 39. However, when Howard walked into the Court Security office, he was approached by four or five deputies who, upon finding out who Howard was stated, "so you're the rat dirty DUI guy." *Id.* This prompted the other deputies to say other derogatory remarks to Howard. *Id.* Howard left because of the hostility and realized that he would not be able to return to Court Security without being harassed by other deputies. *Id.*

Throughout the next several months, Howard continued to endure similar types of harassment from other deputies within the County Sheriff's Office. *Id.* ¶ 40. In the Civil division, Howard was forced to work alone and other employees kept their distance from him once they learned it was Howard who had reported Deputy Tanabe. *Id.*

### 5. Howard Complains to the County Sheriff About Retaliatory Conduct.

On April 12, 2012, at Howard's request, Howard met with County Sheriff David Livingston. Dkt. No. 1 ¶¶ 7, 41. Howard complained about the harassment and retaliation he was experiencing because of Howard's report about Deputy Tanabe, but Sheriff Livingston ignored Howard's complaints. *Id.* ¶ 41. Instead, Sheriff Livingston told Howard that he should consider himself "lucky" that he had not been dismissed and suggested writing a letter of apology for being involved in the "dirty DUI's." *Id.* Sheriff Livingston ended the meeting by telling Howard that he was "too sensitive" and "needed to grow thicker skin." *Id.*

On June 8, 2012, Sheriff Livingston called Howard to inform him that Howard had

1  been removed from the Sheriff's Annual BBQ team that Howard had been a part of for the

2  fifteen years prior.  *Id.* ¶ 42.

3     **6.     Howard Is Terminated.**

4     On August 13, 2012, Howard received a phone call from Sergeant Hebert instructing

5  him that he needed to report to Volunteer Services.  Dkt. No. 1 ¶ 43.  Howard asked the

6  purpose of being called in and Sergeant Hebert replied that he did not know the reason but

7  advised Howard he should be prepared to turn in his gear.  *Id.*  Howard told Sergeant Hebert

8  that he would not attend such a meeting without his lawyer present.  *Id.*  Later, Captain

9  Burton called and told Howard that the purpose of the meeting was to hand Howard a letter.

10 *Id.*  Howard and Captain Burton then scheduled a time to meet so Howard's attorney could

11 attend the meeting as well.  *Id.*

12    On August 14, 2012, Howard and his attorney went to Volunteer Services to meet

13 with Captain Burton.  *Id.* ¶ 44.  Howard was handed a sealed envelope which contained a

14 termination letter dated August 6, 2012.  *Id.*  Captain Burton advised Howard that there

15 would not be a hearing regarding Howard's termination, and that the decision to terminate

16 came from the "highest level" and was "not reversible."  *Id.*

17 **B.   Procedural History**

18    Howard initiated this action by filing a complaint on August 5, 2013.  Dkt. No. 1.

19 The complaint names as defendants Contra Costa County, Sheriff David Livingston,

20 Assistant Sheriff Sean Fawell, the Town of Danville, the Sheriff of Danville, Steven

21 Simpkins, Does 1 through 10 (California public entities), and Does 11 through 50

22 (employees and agents of the County and the Town of Danville).  *Id.*

23    The complaint alleges eight causes of action for relief: (1) for violation of the right to

24 free speech, due process, and to be free from arbitrary action of the government and conduct

25 from an officer that is deliberately indifferent and shocks the conscience under 42 U.S.C. §

26 1983 against Livingston, Fawell and Does 11 through 50; (2) for violation of civil rights

27 under 42 U.S.C. § 1983 against the County and Does 1 through 10 for failing to instruct,

28 supervise, control and/or discipline Livingston and Fawell in the performance of their duties

Case No. 13-cv-03626 NC
ORDER ON MOTION TO DISMISS         8

to refrain from retaliating against Howard for having exercised his constitutionally protected rights; (3) for violation of civil rights under 42 U.S.C. § 1983 against Livingston, Fawell and Does 11 through 50 for failing to instruct, supervise, control and/or discipline employees of the County Sheriff's Office in the performance of their duties to refrain from retaliating against Howard for having exercised his constitutionally protected rights; (4) for violation of California Labor Code § 1102.5 against the County and Does 1 through 50, for retaliating against Howard for reporting the unlawful conduct of Deputy Tanabe; (5) against all defendants for negligent hiring, retention, supervision, and training of their employees and agents, including Deputy Tanabe; (6) under California Civil Code § 52.1, for violation of the right to free speech, due process, to be free from arbitrary action of the government and conduct from an officer that is deliberately indifferent and shocks the conscience, and the right to be free from retaliation under California Labor Code § 1102.5, against the County, Livingston, Fawell and Does 1 through 50; (7) against the County, Livingston, and Does 1 through 50 for negligent hiring, retention, supervision, and training of Fawell and/or Does 11 through 50; and (8) intentional infliction of emotional distress (IIED) against the County, Livingston, Fawell and Does 1 to 50. *Id.*

The Court has subject matter jurisdiction over Howard's 42 U.S.C. § 1983 claims under 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a). All parties have consented to the jurisdiction of a United States magistrate judge under 28 U.S.C. § 636(c). Dkt. Nos. 5, 18.

On October 14, 2013, defendants moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 12. Defendants contend that (1) as to the first and third causes of action, Howard fails to state a claim for retaliation in violation of the First or Fourteenth Amendments or for violation of due process in violation of the Fifth and Fourteenth Amendments; (2) as to the second cause of action, Howard fails to allege a *Monell* claim against any municipal defendant; (3) as to the fourth cause of action, Howard fails to state a claim in that he has not alleged that he has exhausted his administrative remedies and for the additional reason that he has no claim under

California Labor Code § 1102.5 for statements arising out of an official duty; and (4) as to the fifth through eighth causes of action, those claims are barred by California Labor Code §§ 3600, *et. seq.*, and for the additional reason that Howard has failed to state a claim under any theory.

## II. STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully . . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556–57) (internal quotation marks omitted). A court is not required to accept as true conclusory allegations, unreasonable inferences, or unwarranted deductions of fact. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Additionally, a pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Where a court dismisses for failure to state a claim under Rule 12(b)(6), it should normally grant leave to amend unless it determines that the pleading could not possibly be cured by the allegation of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

## III. DISCUSSION

**A.    Defendants' Motion to Dismiss Howard's 42 U.S.C. § 1983 Claims (First and Third) Is Granted in Part and Denied in Part.**

### 1.    The Complaint States a Claim for First Amendment Retaliation.

Howard's first claim for relief under 42 U.S.C. § 1983 states in part that defendants Livingston and Fawell violated his "right to engage in free speech guaranteed by the First Amendment to the United States Constitution" because he was harassed and retaliated

against for speaking on a matter of public concern as a citizen.  Dkt. No. 1 ¶ 46a.  Howard's third claim also seeks relief under 42 U.S.C. § 1983 against Livingston and Fawell for failing to instruct, supervise, control and/or discipline employees of the County Sheriff's Office in the performance of their duties to refrain from retaliating against Howard for having exercised his constitutionally protected rights.  *Id.* ¶ 59.  Howard alleges that he was retaliated against for reporting Deputy Tanabe's conduct during the arrest of Katz on January 14, 2011 and during Deputy Tanabe's February 16, 2011 visit to Howard's home.  *Id.* ¶¶ 23-24.  Howard also alleges that he reported to Livingston that Howard was being harassed and retaliated against for the statements made about Deputy Tanabe.  *Id.* ¶ 41.  Defendants move to dismiss the first and third claims on the ground that Howard was not acting as a private citizen as required to state a claim for retaliation in violation of the First Amendment.  Dkt. No. 12 at 18-22.

"It is well settled that the state may not abuse its position as employer to stifle 'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'"  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013), *cert. denied sub nom.*, *Burbank, Cal. v. Dahlia*, No. 13-620, 2014 WL684080, at *1 (U.S. Feb. 24, 2014) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009)).  The Ninth Circuit has developed a five-step inquiry for First Amendment retaliation cases involving public employees, which asks:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Id.* (quoting *Eng*, 552 F.3d at 1070).  "[A]ll the factors are necessary, in the sense that failure to meet any one of them is fatal to the plaintiff's case."  *Id.* at 1067 n.4.

Here, defendants contend that Howard cannot meet the second element because his speech was part of his official duties and therefore he was not acting as a citizen expressing himself regarding a matter of public concern.  Dkt. No. 12 at 18-22.  When determining

whether an employee's speech was made pursuant to his or her official duties, "[t]he proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006) (citation omitted).  Acknowledging the fact-intensive nature of the inquiry, the Ninth Circuit in *Dahlia* articulated the following guiding principles relevant to determining the scope of a public employee's job duties: (1) whether the employee confined the communication to his chain of command, which generally would be within his duties; (2) what is the subject matter of the communication, i.e., an employee's preparation of a routine report pursuant to normal departmental procedure is typically within his job duties, as contrasted to the employee's communication raising broad concerns about corruption or systemic abuse, which is likely outside of his job duties; and (3) whether the employee speaks in direct contravention to his supervisor's orders, or is threatened or harassed by his superiors for engaging in a particular type of speech, in which case the speech may often fall outside the employee's job duties. *Dahlia*, 735 F.3d at 1074-75.

Applying the factors outlined in *Dahlia*, the Court concludes that the complaint here states a claim for First Amendment retaliation.  Defendants argue that Howard reported his suspicions of misconduct by a fellow officer up the chain of command.  This factor, however, is not dispositive.  Likewise, it is not dispositive that a public employee expresses his views inside his office, or that his speech concerns the subject matter of his employment. *Dahlia*, 735 F.3d at 1069 (citing *Garcetti*, 547 U.S. at 420-21).

Defendants further contend that Howard's conduct is indistinguishable from the officer's conduct in *Dahlia*, where the Ninth Circuit concluded that "the only reasonable conclusion is that Dahlia acted pursuant to his job duties when he—as a detective investigating the Porto's robbery and prior to receiving any threats or orders to the contrary—reported up the chain of command to the supervising lieutenant overseeing the

investigation about abuse related to that same investigation." Dkt. No. 26 at 2:19-3:3 (quoting *Dahlia*, 735 F.3d at 1076). The Court, however, finds that *Dahlia* is distinguishable and agrees with Howard that the complaint alleges facts that could support the conclusion that his reporting of Deputy Tanabe's conduct was not a routine report pursuant to normal departmental procedure.

The facts alleged here, asserting that Deputy Tanabe visited Howard's home in an agitated state in the evening and asked Howard to place a black plastic garbage bag in his attic so it would not be discovered if the police searched Deputy Tanabe's home, support a reasonable inference that Howard did not act pursuant to his official duties. Dkt. No. 1 ¶¶ 21-22. The complaint further alleges that Deputy Tanabe was implicated in a larger investigation which involved an arrest of Butler and the County Narcotics Enforcement Team Assistant Sheriff by the State of California Department of Justice, which also supports an inference that Howard's report raised broader concerns about corruption, not limited to Howard's job duties related to the arrest of Katz. *Id.* The complaint alleges that Howard reported Deputy Tanabe's conduct to Lieutenant Wright verbally and that Howard was not on duty nor in uniform when he made that report. *Id.* ¶ 24. Howard was further informed that he would not be working for the County Sheriff's Office that day. *Id.* When Howard emailed Sergeant Gruenheid of Volunteer Services with his concerns of having to provide a sworn statement that might adversely affect the criminal investigation surrounding Deputy Tanabe and the arrest of Katz, she responded that as far as she was concerned, Howard was "on [his] own." *Id.* ¶ 30.

Additionally, while the complaint alleges that Howard was instructed by his supervisor to report to the Field Offices Bureau, Howard was also told at the beginning of the interview that he was being treated as a civilian and not as an employee. *Id.* ¶¶ 24-25. Howard's initial report was not pursuant to an order, and it was in fact, in direct contravention to the request by Deputy Tanabe to conceal the item. Moreover, Howard alleges that, in a meeting to address his role in the Katz arrest, Assistant Sheriff Fawell told Howard "if you were a regular, I would have fired your ass." *Id.* ¶ 34. Later, at the

1   Sheriff's Annual BBQ, Assistant Sheriff Fawell approached Howard, accused him of
2   having a lack of team spirit and of having a borderline disrespectful demeanor, and stated
3   that he was "keeping an eye on" Howard.  *Id.*  ¶ 37.  Based on these allegations, it could be
4   inferred that Howard was threatened or harassed by his superiors for reporting Deputy
5   Tanabe's conduct.

6        These alleged facts support Howard's contention that his statements were not made in
7   his official capacity as an officer.  While defendants attempt to discount some of the facts as
8   "ambiguous," Dkt. No. 26 at 3:4-12, drawing all reasonable inferences in Howard's favor,
9   the Court concludes that Howard has adequately alleged that his reporting of Deputy
10  Tanabe's conduct is protected by the First Amendment.

11       Defendants argue that Howard's testimony at Deputy Tanabe's criminal trial shows
12  that his report was made on his next duty day, and that this testimony contradicts the
13  allegation in the complaint that Howard was not on duty when he made the report.  Dkt. No.
14  12 at 22:12-20.  Howard responds that, while he may have been scheduled to work at some
15  point on the day he made the report, he was not on duty.  Dkt. No. 23 at 18 n.6.  The Court
16  declines to take judicial notice of Howard's testimony at the criminal trial because, even if
17  it creates a disputed issue of fact as to whether Howard was on duty when he made his
18  report, the dispute must be resolved in Howard's favor at the pleading stage.

19       Defendants also contend that Howard's report was within his official duties based on
20  the grounds that (1) he had an affirmative duty under state law to report Deputy Tanabe's
21  misconduct, Dkt. No. 12 at 21:12-25; and (2) Sheriff's Office policies, of which defendants
22  request the Court to take judicial notice, required Howard to report Deputy Tanabe's
23  misconduct, Dkt. No. 12 at 22:1-11.  Defendants' arguments, however, are not conclusive in
24  determining the scope of Howard's job duties.  The Supreme Court has "rejected 'the
25  suggestion that employers can restrict employees' rights by creating excessively broad job
26  descriptions." *Dahlia*, 735 F.3d at 1069 (quoting *Garcetti*, 547 U.S. at 424).  The Ninth
27  Circuit in *Dahlia* also disagreed with the proposition that "police officers are unique under
28  California law for the purpose of First Amendment retaliation claims . . . because California

1   police officers have a freestanding professional duty to disclose the unlawful conduct of

2   others to their superiors as well as to outside law enforcement agencies." *Dahlia*, 735 F.3d

3   at 1071.  Defendants' request for judicial notice of the County Sheriff's Office policies is,

4   therefore, denied.[1]

5       In his opposition to the motion to dismiss, Howard also argues that his report to

6   Sheriff Livingston that Howard was being harassed and retaliated against for the statements

7   he made about Deputy Tanabe is also protected speech that can support his claim of First

8   Amendment retaliation.  Dkt. Nos. 23 at 19:1-7; 1 ¶¶ 7, 41.  Defendants argue that this

9   theory is precluded by the principle that the First Amendment does not "protect a public

10  employee's right to speak internally about matters of purely personal interest."  Dkt. No. 26

11  at 4:4-16 (citing *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Gearhart v. Thorne*, 768 F.2d

12  1072, 1073 (9th Cir. 1985)).

13      The Supreme Court has held that "[w]hether an employee's speech addresses a matter

14  of public concern must be determined by the content, form, and context of a given

15  statement, as revealed by the whole record."  *Connick*, 461 U.S. at 147-48.  "Unlawful

16  conduct by a government employee or illegal activity within a government agency is a

17  matter of public concern."  *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004)

18  (citations omitted).  Furthermore, "reporting police abuse and the attempts to suppress its

19  disclosure—is quintessentially a matter of public concern."  *Dahlia*, 735 F.3d at 1067

20  (citations omitted); *see also Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009) (county

21  employee follow-up communications, sent after he failed to receive adequate response to

22  his earlier reports of misconduct by fellow officers, "clearly addressed at least two matters

23  of public concern: the misconduct itself and the distinct question of whether the

24  investigating officers were . . . sweeping misconduct under the rug.").  The fact that a public

25  employee's speech also involves some element of private interest does not preclude a First

26

27  _____

    [1] Defendants' remaining requests for judicial notice are also denied as they do not bear on the

28  Court's determination of the issues presented by the pending motions to dismiss.  Dkt. Nos. 13, 14, 27.

Amendment retaliation claim.  *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1130 (9th Cir. 2008) (agreeing with the Sixth Circuit that "statements presenting 'mixed questions of private and public concern' properly fall within the scope of First Amendment protection." (citation omitted)).

Here, Howard has alleged facts supporting an inference that his speech was not limited to an issue of "purely personal interest" as defendants argue.  The two cases cited by defendants are factually distinguishable.  In *Connick*, plaintiff circulated a questionnaire to her coworkers soliciting comments about office policies, morale, and level of confidence in supervisors.  461 U.S. at 148.  The Court concluded that the questions, with one exception, did not relate to matters of public concern but were mere extensions of plaintiff's dispute over her transfer to another section of the criminal court.  *Id.* at 148-49.  Similarly, in *Gearhart*, the Ninth Circuit found that an employee's grievances related only to refuting false charges of his ineptitude, allegedly brought in retaliation for his actions, and were thus "matters only of personal interest," not entitled to First Amendment protection.  768 F.2d at 1073.  Unlike the speech in *Connick* and *Gearhart*, Howard's report to Sheriff Livingston implicated Howard's statements about Deputy Tanabe's misconduct, as well as the County Sheriff's Office's response to the disclosure of that misconduct.  The Court is not persuaded by defendants' contention that Howard's speech was simply an internal personnel grievance and does not rise to the level of a matter of public concern.

Accordingly, defendants' request to dismiss Howard's claim under 42 U.S.C. § 1983 for violation of the First Amendment is denied.

**2.      The Complaint Fails to State a Claim for Violation of Due Process.**

Howard's first claim for relief under 42 U.S.C. § 1983 is based on the alternative ground that defendants violated his right to due process by failing to provide him with a "name-clearing" hearing after his termination.  Dkt. No. 1 ¶ 46b.  Defendants contend that this claim should be dismissed because (1) a name-clearing hearing was not constitutionally necessary; and (2) Howard's claim is barred due to his failure to request a name-clearing hearing.

The requirements of procedural due process apply "when a constitutionally protected liberty or property interest is at stake." *Matthews v. Harney Cnty., Or., Sch. Dist. No. 4*, 819 F.2d 889, 891 (9th Cir. 1987) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)). "[A] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality." *Id.* The procedural protections of due process are triggered if (1) "the accuracy of the charge is contested"; (2) "there is some public disclosure of the charge"; and (3) "the charge is made in connection with termination of employment." *Id.* at 891-92 (citations omitted). "[A] terminated employee has a constitutionally based liberty interest in clearing his name when stigmatizing information regarding the reasons for the termination is publicly disclosed." *Cox v. Roskelley*, 359 F.3d 1105, 1110 (9th Cir. 2004) (citing *Roth*, 408 U.S. at 573). "Failure to provide a 'name-clearing' hearing in such a circumstance is a violation of the Fourteenth Amendment's due process clause." *Id.*

### (a)    *Howard Has Failed to Allege Facts Triggering the Requirement to Provide a Name-Clearing Hearing.*

Defendants argue that Howard has not shown he was entitled to a name-clearing hearing because he does not allege that he was terminated based on any act of dishonesty or malfeasance, nor does he allege that defendants disseminated a stigmatizing charge against him in connection with his termination. Dkt. No. 12 at 23:15-24.

In his opposition, Howard does not argue that defendants charged him with any misconduct or that there was a public disclosure of the charge. Instead, he argues that he was entitled to a name-clearing hearing based on the following allegations: (1) he "was linked to Deputy Tanabe's case and the Dirty DUI's through various pre-termination media reports," Dkt. No. 1 ¶ 28; (2) he "was already 'stigmatized' by these reports throughout the community prior to his termination"; (3) "Defendants knew that terminating Plaintiff while these media reports were swirling would certainly create the impression that Plaintiff had also engaged in improper conduct resulting in his termination"; and thus (4) "[t]erminating Plaintiff while the on-going criminal cases against Deputy Tanabe and Butler were pending

1  impacted Plaintiff's 'good name, reputation, honor [and] integrity.'"  Dkt. No. 23 at 20:8-
2  17.

3      As an initial matter, the facts alleged in the complaint do not support the contention
4  that Howard was stigmatized throughout the community by media reports and that
5  defendants knew that terminating Howard while these media reports were swirling would
6  create the impression that he had also engaged in improper conduct resulting in his
7  termination.  The complaint merely alleges that "[i]n the media reports, [Howard] was
8  identified as the person who reported Deputy Tanabe to the County regarding the Katz
9  arrest."  Dkt. No. 1 ¶ 28.  Howard's due process claim is thus based on impermissible
10  speculation.

11      Moreover, even if Howard's assertions were supported by facts in the complaint, they
12  would not be sufficient to trigger the procedural due process protections because there are
13  no facts alleged showing that defendants charged him with misconduct and publicized the
14  charge.  Howard has failed to cite to any authority supporting his contention that a name-
15  clearing hearing is required in such circumstances.  The two California cases cited in his
16  opposition are inapposite because, unlike this case, they involve the termination of police
17  officers for alleged misconduct and the maintenance of stigmatizing information in their
18  personnel files.  Dkt. No. 23 at 20:18-28 (citing *Murden v. Cnty. of Sacramento*, 160 Cal.
19  App. 3d 302, 309 (1984); *Lubey v. City and Cnty. of S.F*, 98 Cal. App. 3d 340 (1979)).

20      "The Supreme Court has stated that a hearing for a nontenured employee based on
21  stigmatization is required '[o]nly if the employer creates and disseminates a false and
22  defamatory impression about the employee in connection with his termination.'"  *Fleisher*
23  *v. City of Signal Hill*, 829 F.2d 1491, 1495 (9th Cir. 1987) (quoting *Codd v. Velger*, 429
24  U.S. 624, 628 (1977) (per curiam)); *see also Debose v. U.S. Dep't of Agric.*, 700 F.2d 1262,
25  1266 (9th Cir. 1983) ("A liberty interest in future employment is only abridged when an
26  employee's termination creates a stigma foreclosing freedom to take advantage of other
27  employment opportunities . . . . There can be no such stigma when there is no public
28  disclosure of the reasons for discharge." (citations omitted)).  As stated by the Supreme

Court in *Roth*, due process accords an employee an opportunity to refute the employer's charge against him where "a person's good name, reputation, honor, or integrity is at stake *because of what the government is doing to him*." 408 U.S. at 573 (citations omitted) (emphasis added).

While the parties have not cited to any binding authority addressing the precise argument made by Howard here, and the Court is not aware of any, cases outside of this Circuit have found that, in some circumstances, an "explicit public statement" accusing the discharged employee of immoral or illegal conduct may not be necessary. Those cases, however, have markedly different facts. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445-47 (2d Cir. 1980) (City officials arguably publicized false and stigmatizing charges against plaintiff despite the absence of an explicit public charge where they "engineered a purposeful campaign" to thrust upon plaintiff the onus of responsibility for missing funds, and where "the existence of a criminal investigation, the press reports linking [plaintiff] with that investigation, and the role of the defendants in initiating a criminal inquiry all ma[de] it arguable that they openly charged [plaintiff] with illegal and immoral conduct."); *McGhee v. Draper*, 564 F.2d 902, 906-10 (10th Cir. 1977) (where teacher had been made the subject of public accusations of allegedly immoral conduct and those accusations were aired at a public hearing of the school board, the board's discharge of her "against this immediate background raised a substantial question whether the board declining to re-employ had imposed a stigma or other disability which foreclosed plaintiff's freedom to take advantage of other employment opportunities."); *Fraternal Order of Police Lodge No. 5 v. Tucker*, 868 F.2d 74, 83 (3d Cir. 1989) ("When a police department announces to the media that it has information sufficient to occasion an investigation of on-duty drug use, that in this context the officer under investigation refused urinalysis, and that the Department considered the overall situation such as to warrant dismissal, other law enforcement agencies are unlikely to consider the officer for other employment because, at least without more information than that reported, they will conclude that the officer is more likely than not guilty as charged."). *Cf. Melton v. City of Oklahoma City*, 928 F.2d 920, 931

(10th Cir. 1991) ("[T]he mere reporting of the defamatory accusations of a third party will not make governmental agencies or governmental officials liable for the deprivation of a protected liberty interest.  That conclusion does not hold, however, if the governmental entity overtly or impliedly adopts those defamatory accusations as the basis for punitive action against an employee.").

Here, the complaint contains no allegations that defendants made any charges against Howard or investigated him for improper conduct in connection with the "dirty DUI's." Moreover, there is no allegation that such charges or investigation were publicized by the defendants.  There is no allegation implicating defendants in creating a media campaign of innuendo as to misconduct by Howard.  Neither is there any allegation of accusations against Howard made by a third party that were expressly or impliedly adopted by defendants.  Howard also does not allege that the fact of his termination was publicized by defendants.  The argument that Howard was stigmatized by defendants because of the mere fact of his termination and the existence of unspecified media reports "link[ing him] to Deputy Tanabe's case and the Dirty DUI's" is not sufficient to trigger the requirement to provide a name-clearing hearing.

Moreover, in the absence of any allegations that defendants charged Howard with any misconduct or that the charges were disputed, it is unclear a name-clearing hearing would serve any useful purpose. *See Codd v. Velger*, 429 U.S. 624, 627 (1977) ("[T]he remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the charge.' . . . 'The purpose of such notice and hearing is to provide the person an opportunity to clear his name,' . . . But if the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute between an employer and a discharged employee which has some significant bearing on the employee's reputation.").

Howard's claim relief under 42 U.S.C. § 1983 for violation of due process is dismissed with leave to amend.

//

### (b)    Howard's Due Process Claim Is Not Barred Due to His Failure to Request a Name-Clearing Hearing.

Defendants also argue that Howard's due process claim must be dismissed because he did not request a name-clearing hearing prior to filing this action.  Defendants argue that, while the Ninth Circuit does not have a published opinion directly on point, a majority of other circuits have determined that a plaintiff is required to request a name-clearing hearing prior to filing a deprivation of liberty interest claim.  Dkt. No. 12 at 23:28-24:3; *see Holscher v. Olson*, No. 07-cv-3023, 2008 WL 2645484, at *12 (E.D. Wash. June 30, 2008) (acknowledging the lack of Ninth Circuit authority on point and following other circuit authority in holding that failure to request a name-clearing hearing barred plaintiff's liberty interest claim).  Other district courts in the Ninth Circuit, however, have declined to impose such a requirement.  *See, e.g.*, *Adcock v. City of Canby*, No. 09-cv-1301, 2011 WL 609799, at *8 (D. Or. Feb. 15, 2011) (finding that "plaintiff's failure to request a name clearing hearing prior to this lawsuit is not dispositive on the issue of summary judgment."); *Boggs v. Hoover*, No. 09-cv-116, 2009 WL 2447553, at *8 (D. Or. Aug. 6, 2009) (holding, in light of the absence of Supreme Court or Ninth Circuit precedent, that failure to request a name-clearing hearing did not preclude plaintiff from bringing a denial of due process claim); *Tibbetts v. State Acc. Ins. Fund Corp.*, No. 06-503, 2008 WL 4144441, at *5-7 (D. Or. Sept. 4, 2008) (observing that "[n]either the Supreme Court nor the Ninth Circuit have required plaintiffs to request a name-clearing hearing prior to filing a section 1983 action for deprivation of a liberty interest," but finding that plaintiffs' communications disputing the basis for their termination provided adequate notice to employer of the need for a name-clearing hearing that would satisfy such a requirement).

Because the Court dismisses Howard's claim for violation of due process and it is unclear whether he will be able to allege facts that state a due process claim, the Court does not need to reach this issue.  Moreover, even if the Supreme Court or Ninth Circuit were to impose a general requirement that a plaintiff must first request a name-clearing hearing before bringing a due process claim, it is unlikely that such a requirement would apply in

the specific circumstances here where Howard was specifically told at his termination meeting that he would not have a name-clearing hearing and that the decision came from the "highest level" and was "not reversible."  Dkt. No. 1 ¶ 44.

### 3.    The § 1983 Claim Against Defendant Fawell Is Barred by the Statute of Limitations.

Defendants move to dismiss the § 1983 claim against Fawell as barred by the applicable statute of limitations.  Dkt. No. 12 at 25:7-19; 26 at 5:15-6:2.

Neither defendants, nor Howard in his opposition, distinguish between the individual and official capacity in which Fawell is sued.  The complaint states that each individual defendant is sued in his individual capacity as well as official capacity.  Dkt. No. 1 ¶ 10.  However, an "official capacity" suit against a governmental officer is equivalent to a suit against the governmental entity itself.  *Larez v. City of L.A.*, 946 F.2d 630, 646 (9th Cir. 1991) (citation omitted).  Because the Court finds elsewhere in this order that the complaint fails to state a *Monell* claim based on an unconstitutional policy or custom, Fawell may not be held liable under § 1983 in his official capacity.  Moreover, "if individuals are being sued in their official capacity as municipal officials *and* the municipal entity itself is also being sued, then the claims against the individuals are duplicative and should be dismissed." *Vance v. Cnty. of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996); *see also Haines v. Brand*, No. 11-cv-1335 EMC, 2011 WL 6014459, at *3 (N.D. Cal. Dec. 2, 2011) (dismissing with prejudice § 1983 claims against city employees on the ground that an "official capacity" suit would "only duplicate Plaintiff's claim against the City, as they both depend on the same theory of liability.").  Accordingly, the § 1983 claim against Fawell in his official capacity is dismissed without prejudice.

Additionally, as a supervisor, Fawell may be held liable in his individual capacity under § 1983 if he "was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation."  *Edgerly v. City & Cnty. of S.F.*, 599 F.3d 946, 961 (9th Cir. 2010) (quoting *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418 (9th Cir. 2003)).  However, the Court agrees that the

§ 1983 claim against Fawell in his individual capacity must also be dismissed because, as currently alleged, it is time-barred.

A claim accrues when the plaintiff "knows or has reason to know of the injury which is the basis of the action." *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999). Because 42 U.S.C. § 1983 does not prescribe a limitations period, the Court applies California's two-year statute of limitations for personal injury actions, set forth in California Civil Procedure Code § 335.1. *TwoRivers*, 174 F.3d at 991 (citing *Wilson v. Garcia*, 471 U.S. 261, 279-80 (1985)). Here, the only retaliatory conduct alleged against Fawell occurred in June to July 2011. Dkt. No. 1 ¶¶ 34, 37. Under the two-year statute of limitations, Howard's § 1983 claim against Fawell in his individual capacity expired on July 31, 2013. Because Howard initiated this action on August 5, 2013, his claim against Fawell is time-barred. Dkt. No. 1.

In opposition, Howard argues that he was "continually harassed and retaliated against by both his superiors and his peers within the same organization," and, therefore, "the acts were cumulative in effect and there is no statute of limitations issue with respect to the 42 U.S.C. 1983 claim filed against Defendant Fawell." Dkt. No. 23 at 22:6-12. In support for his position, Howard cites to *Richards v. CH2M Hill, Inc.*, 26 Cal. 4th 801 (2001) and *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1056 (2005). However, the Supreme Court has rejected the "continuing violation" theory in retaliation cases, stating that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Although *Morgan* was a Title VII case, the Ninth Circuit has applied *Morgan* to bar § 1983 claims predicated on discrete time-barred acts, notwithstanding that those acts are related to timely-filed claims. *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822, 829 (9th Cir. 2003); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 (9th Cir. 2002); *see also McCollum v. California*, 610 F. Supp. 2d 1053, 1057 (N.D. Cal. 2009) *aff'd*, 647 F.3d 870 (9th Cir. 2011) ("The claims in this lawsuit allege discrete discriminatory acts by different people at different times and at different institutions and thus the continuing violation doctrine is inapplicable."). Howard's citations

to *Richards* and *Yanowitz* are inapposite because they do not follow the *Morgan* rule.  *See Yanowitz*, 36 Cal. 4th at 1057-59 ("[F]oreclosing the application of the continuing violation doctrine in a case such as this one, where the plaintiff alleges a retaliatory course of conduct rather than a discrete act of retaliation, would undermine the fundamental purpose of the FEHA by encouraging early litigation and the adjudication of unripe claims.).

Howard alleges that different employees took retaliatory actions against him.  To the extent there is an actionable claim for Fawell's conduct in June and July 2011, the cause of action for those acts accrued on the date each of them occurred.  To the extent Howard intends to allege a § 1983 claim based on other acts of harassment or retaliation aside from the alleged conduct by Fawell in June and July 2011, Howard has not alleged any facts plausibly linking Fawell to those other alleged unconstitutional acts.  However, because it is not clear that Howard could not amend the complaint to state a § 1983 claim against Fawell that is within the statute of limitations, the claim against him in his individual capacity is dismissed with leave to amend.

**B.   Defendants' Motion to Dismiss Howard's 42 U.S.C. § 1983 Claim (Second) Against Contra Costa County or Danville Is Granted.**

Howard's second claim for relief is for violation of civil rights under 42 U.S.C. § 1983 against the County and Does 1 through 10 for "intentionally, knowingly, recklessly, or with deliberate indifference to the rights of Plaintiff, fail[ing] to instruct, supervise, control and/or discipline, on a continuing basis, Defendants Livingston and Fawell and/or Does 11 through 50, inclusive, in the performance of their duties to refrain from retaliating against Plaintiff for having exercised his constitutionally protected rights."  Dkt. No. 1 ¶ 51. The complaint alleges that "Defendants Livingston and Fawell and/or Does 11 through 50, inclusive, were acting . . . pursuant to either official policy or the practice, custom, and usage of Defendants [County] and/or Does 1 through 10."  *Id.* ¶ 50.  Defendants move to dismiss on the basis that Howard's allegations against the Town and the County are conclusory and thus fail to state a claim under *Monell*.  Dkt. No. 12 at 27:1-8.

//

It is well established that "a municipality cannot be held liable *solely* because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). For the City to be liable under § 1983, a municipal "policy or custom" must have caused the constitutional injury. *Id.* at 694. "A policy can be one of action or inaction." *Waggy v. Spokane Cnty. Wash.*, 594 F.3d 707, 713 (9th Cir. 2010) (citations omitted). "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality," however; "[t]he plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). Municipal liability under § 1983 may be established in any one of three ways: (1) "the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citations and internal quotation marks omitted).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359-60 (2011) (citation omitted). A *Monell* claim based on inadequate training requires that the claimant allege and prove that the failure to provide a particular kind of training showed deliberate indifference to the possibility of a constitutional violation. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Training is inadequate for purposes of § 1983 when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,

that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 131 S. Ct. at 1359 (citation omitted).

Previously, the rule in the Ninth Circuit was that "a claim of municipal liability under section 1983 is sufficient to withstand a motion to dismiss 'even if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice.'" *Karim–Panahi v. L.A. Police Dep't*, 839 F.2d 621, 624 (9th Cir.1988) (quoting *Shah v. County of L.A.*, 797 F.2d 743, 747 (9th Cir. 1986)). Following the Supreme Court's decisions in *Twombly* and *Iqbal*, courts in this Circuit have moved away from this lax standard. *Cuviello v. City & Cnty. of S.F.*, 940 F. Supp. 2d 1071, 1090 (N.D. Cal. 2013) (citing *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012)). The Ninth Circuit explained that the following two principles apply to *Monell* claims: (1) a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively"; and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *AE*, 666 F.3d at 637 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

In this case, Howard does not contend that the constitutional violations were committed by or ratified by an official with final policy-making authority. Instead, Howard is premising his *Monell* claim against the County based on an alleged policy or custom in "fail[ing] to instruct, supervise, control and/or discipline" employees "to refrain from retaliating against Plaintiff for having exercised his constitutionally protected rights." Dkt. No. 1 ¶ 51. These allegations do little more than assert legal conclusions. The complaint does not identify what the training practices were, or how they were deficient. *See AE*, 666 F.3d at 637; *Harris v. City of Clearlake*, No. 12-cv-0864 YGR, 2013 WL 120965, *4-5

(N.D. Cal. Jan. 8, 2013).  *Cf. Mateos-Sandoval v. Cnty. of Sonoma*, 942 F. Supp. 2d 890, 900 (N.D. Cal. 2013) (denying motion to dismiss *Monell* claim finding that plaintiffs' allegations sufficiently "specify the content of the policies, customs, or practices the execution of which gave rise to Plaintiffs' constitutional injuries"); *Haines v. Brand*, No. 11-cv-1335 EMC, 2011 WL 6014459, at *5 (N.D. Cal. Dec. 2, 2011) (plaintiff sufficiently identified relevant policy or custom by alleging that the City "failed or refused to adequately fund, employ, train, supervise, evaluate or discipline [Mobile Crisis Team ("MCT")] members as to their response to persons seeking sources of physical sustenance and desiring to obtain lay counseling who, while detained by police, do thereafter assert their fundamental rights when approached and questioned by MCT members"; "[a]t no relevant time did the MCT have adequate resources and relevant training necessary to properly assess every traumatized person within the City of Berkeley"; and that plaintiff and others like him "are customarily targeted by the Telegraph team for police detentions prior to face-to-face assessment.").

In his opposition, Howard argues that "the municipalities' failures to instill its officers with the appropriate skills and training necessary to address these situations evidences a custom in which police officers are frowned upon for reporting serious matters of public concern such as corruption and abuse within their departments."  Dkt. No. 23 at 22:22-28. Such a custom, however, is not alleged in the complaint.  Because Howard has failed to sufficiently allege a *Monell* claim against the County, or the Town, defendants' motion to dismiss the second claim for relief is granted with leave to amend.

## C.   Defendants' Motion to Dismiss the 42 U.S.C. § 1983 Claim Against Defendant Simpkins Is Granted.

Defendants move to dismiss Howard's § 1983 claim against Simpkins on the basis that the complaint fails to allege any facts to infer liability against him on any theory.  Dkt. Nos. 12 at 24:9-25:6; 26 at 6:3-11.  The Court agrees.

The complaint alleges that defendant Simpkins is the sheriff and policymaker of Danville.  Dkt. No. 1 ¶ 9.  The complaint further alleges that defendants Livingston, Fawell,

1   and Simpkins were acting "under the color of the statutes, ordinances, regulations, policies,

2   customs, practices and usages" of Danville, the County, and the State of California, and that

3   "the wrongful acts hereinafter described flow from the very exercise of their authority." *Id.*

4   ¶ 11.

5       As an initial matter, to the extent Howard seeks to bring a § 1983 claim against

6   Simpkins in his official capacity, that claim is dismissed without prejudice for the same

7   reasons as stated above with respect to defendant Fawell.

8       Additionally, as a supervisor, Simpkins may be held liable in his individual capacity

9   under § 1983 if he "was personally involved in the constitutional deprivation or a sufficient

10  causal connection exists between the supervisor's unlawful conduct and the constitutional

11  violation." *Edgerly*, 599 F.3d at 961 (quoting *Lolli v. Cnty. of Orange*, 351 F.3d 410, 418

12  (9th Cir. 2003)). Supervisors "can be held liable for: (1) their own culpable action or

13  inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the

14  constitutional deprivation of which a complaint is made; or (3) for conduct that showed a

15  reckless or callous indifference to the rights of others." *Id.* (quoting *Cunningham v. Gates*,

16  229 F.3d 1271, 1292 (9th Cir. 2000)); *see also Larez*, 946 F.2d at 645-46 (a supervisor's

17  individual liability "hinges upon his participation in the deprivation of constitutional

18  rights," which "may involve the setting in motion of acts which cause others to inflict

19  constitutional injury.").

20      In his opposition, Howard argues that defendant Simpkins is liable under § 1983

21  because he "failed to adequately supervise his officers thus denying Plaintiff of his

22  constitutional and statutory rights, privileges, and immunities." Dkt. No. 23 at 21:13-24.

23  However, the complaint does not allege any facts plausibly linking Simpkins to the alleged

24  unconstitutional conduct. The § 1983 claim against Simpkins in his individual capacity is

25  dismissed with leave to amend.

26  **D.   Defendants' Motion to Dismiss Howard's Claim for Retaliation in Violation of California Labor Code § 1102.5(b) (Fourth) Is Denied.**

27

28      Howard's fourth claim is for violation of California Labor Code § 1102.5 against the

County for retaliating against Howard for reporting the unlawful conduct of Deputy Tanabe. Dkt. No. 1 ¶¶ 65-67.  California Labor Code § 1102.5(b) prohibits retaliation by an employer against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.  Cal. Lab. Code § 1102.5(b).

Defendants move to dismiss this claim on two grounds: (1) that Howard has not alleged that he has exhausted his administrative remedies; and (2) that he has no claim under Labor Code § 1102.5 for statements arising out of an official duty.

### 1.     Howard Was Not Required to File a Complaint with the California Labor Commissioner as a Prerequisite for Commencing a Lawsuit Under California Labor Code § 1102.5(b).

California Labor Code § 98.7(a) states:

> Any person who believes that he or she has been discharged or otherwise discriminated against in violation of any law under the jurisdiction of the Labor Commissioner *may* file a complaint with the division within six months after the occurrence of the violation.

Cal. Labor Code § 98.7(a) (emphasis added).  In addition, California Labor Code section 98.7(f) provides that "[t]he rights and remedies provided by this section do not preclude an employee from pursuing any other rights and remedies under any other law." *Id.* § 98.7(f).

There is a split of authority as to whether California Labor Code § 98.7 requires a plaintiff to exhaust the Labor Code's administrative remedy or whether it merely provides an alternative remedy.  The only post-*Campbell* published opinion by the California Court of Appeals on this question, *Lloyd v. Cnty. of L.A.*, 172 Cal. App. 4th 320, 331-32 (2009) held that administrative remedy exhaustion is not required and that § 98.7 "merely provides the employee with an additional remedy, which the employee may choose to pursue." While defendants rely on *MacDonald v. State*, 219 Cal. App. 4th 67 (2013), which disagreed with *Lloyd* and held that administrative exhaustion is required, that case was recently depublished.  Dkt. Nos. 12 at 28:16-21; 26 at 7:16-26.

In support of their position, defendants also rely on the California Supreme Court's

decision in *Campbell v. Regents of Univ. of Cal.*, 35 Cal. 4th 311, 317 (2005).  In *Campbell*, the Court recited the general rule under California law that "where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act."  *Id.* at 321.  The Court held that because university policy required employees to resort initially to internal grievance practices and procedures, university employees had an administrative remedy that they were required to exhaust before suing under California Labor Code § 1102.5.  *Id.* at 317, 324.

While *Campbell* did not address § 98.7, a number of federal district courts have extended *Campbell* to require a plaintiff to file a complaint with the Labor Commissioner under § 98.7(a) as a prerequisite to filing a lawsuit alleging a violation under Labor Code § 1102.5.  *See Melgar v. CSK Auto, Inc.*, No. 13-cv-3769 EMC, 2014 WL 546915, *2 (N.D. Cal. Feb. 7, 2014) ("The majority of federal district courts to address this question have held that a plaintiff must file a complaint with the Labor Commissioner under section 98.7(a) before filing a lawsuit alleging a violation under Labor Code sections 98.6 or 1102.5.").  For example, both *Miller v. Sw. Airlines, Co.*, 923 F. Supp. 2d 1206, 1210 (N.D. Cal. 2013), and *Ferretti v. Pfizer Inc.*, 855 F. Supp. 2d 1017, 1023 (N.D. Cal. 2013), interpreted *Campbell* as holding that § 98.7(a) provides an administrative remedy that a plaintiff must exhaust before filing a § 1102.5 claim.  In *Reynolds v. City and Cnty. of S.F.*, No. 09-cv-0301 RS, 2011 WL 4808423, at *1 (N.D. Cal. Oct. 11, 2011), the Court found that, while the issue in *Campbell* was only whether a plaintiff had to exhaust internal administrative remedies, its reasoning applied to the exhaustion requirements of the Labor Code as well.

However, a number of other courts have reached the opposite conclusion, finding that *Campbell* did not resolve the application of § 98.7 and finding persuasive that the language of § 98.7 is permissive and does not itself require exhaustion.  *Melgar*, 2014 WL 546915, at *2; *Dowell v. Contra Costa Cnty.*, 928 F. Supp. 2d 1137, 1153 (N.D. Cal. 2013); *Turner v. City and Cnty. of S.F.*, 892 F. Supp. 2d 1188, 1200 (N.D. Cal. 2012) (reconsideration denied).  This Court finds this interpretation persuasive.

In addition, the California legislature recently implemented Labor Code § 244, which states that administrative exhaustion is not required unless the specific section expressly mandates it.  Cal. Labor Code § 244(a) (effective January 1, 2014).  The Court in *Melgar* held that § 244(a) "expressly rejects a general mandatory exhaustion requirement in Labor Code cases."  *Melgar*, 2014 WL 546915, at *2.  The Court further noted that "[t]he legislative history of section 244 suggests the legislature did not intend to amend the current state of the law, but rather sought to 'clarify[] that an employee or job applicant is not required to exhaust administrative remedies or procedures in order to bring a civil action under any provision of the Labor Code.'"  *Id.*  at *4 (quoting *Gonzalez v. City of McFarland*, No. 13-cv-00086, 2014 WL 294581, at *2 (E.D. Cal. Jan. 24, 2014)).  The Court concluded that "because section 244 does not create new rights . . . or impose new liabilities . . . , the Court finds that it applies to this case and confirms this Court's prior reasoning in *Turner*."  *Id.* (citing *Gonzalez*, 2014 WL 294581, at *2).

This Court joins *Melgar*, *Dowell*, and *Turner*, in holding that Howard was not required to file a complaint with the Labor Commissioner under § 98.7(a) as a prerequisite to filing a claim under Labor Code § 1102.5.

### 2.    Defendants' Argument that Howard's Reporting Was Within His Job Duties Does Not Preclude His Claim Under § 1102.5(b).

Defendants also argue that Howard's § 1102.5 claim should be dismissed because his alleged whistleblowing activity was within his general job duties, and therefore, is not actionable under California Labor Code § 1102.5.  Dkt. No. 12 at 29:6-27.

In support of this argument, defendants contend that a California Court of Appeal has held that an employee cannot sustain a claim under § 1102.5 when notifying the employer about suspected actions is consistent with the employee's job duties, citing *Edgerly v. City of Oakland*, 211 Cal. App. 4th 1191, 1207 (2012).  The *Edgerly* court found that reimbursement requests did not violate state law and that plaintiff's refusal to pay reimbursement requests that the plaintiff believed were inappropriate was consistent with, if not required by, her job duties as a city administrator and therefore not a protected activity

under California Labor Code § 1102.5(c) (prohibiting employers from retaliating against an employee "for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation"). *Id.* at 1207.

The *Edgerly* opinion does not support defendants' position that Howard's reporting of Deputy Tanabe's misconduct is not actionable as a whistleblowing activity under § 1102.5(b) because it is "consistent" with Howard's "general job duties." *See also Colores v. Bd. of Trustees*, 105 Cal. App. 4th 1293, 1311-12 (2003) (holding that the fact that the plaintiff "was simply doing her job when she uncovered the unauthorized use of state assets . . . associated with facilities operations" did not defeat her right to whistleblower status under § 1102.5(b)); *Jaramillo v. Cnty. of Orange*, 200 Cal. App. 4th 811, 825-26 (2011) (holding that assistant sheriff's report to county sheriff of wrongdoing by the sheriff himself, who subsequently summarily dismissed assistant sheriff, was protected by the state whistleblower statute).[2]

Moreover, at the pleading stage, the Court cannot conclude as a matter of law that "when Plaintiff reported the Tanabe incidents to Lt. Wright, he was simply performing his job duties." Dkt. No. 12 at 29:19-27.  Defendants' request to dismiss Howard's § 1102.5 claim is also denied on this basis.

**E.   Defendants' Motion to Dismiss Howard's Claims for Negligent Hiring (Fifth and Seventh) and IIED (Eighth) Is Granted.**

**1.   Howard's Fifth, Seventh, and Eighth Causes of Action Are Barred by the Workers' Compensation's Exclusivity Rule.**

Howard's fifth and seventh claims for relief are for negligent hiring, retention, supervision, and training of Deputy Tanabe and Fawell.  In connection with his fifth claim, Howard alleges that defendants knew or should have known that Deputy Tanabe would

---

[2] The Court notes that California Labor Code § 1102.5(b) was amended recently, specifying that retaliation is prohibited "regardless of whether disclosing the information is part of the employee's job duties." Cal. Lab. Code § 1102.5(b) (effective January 1, 2014).

abuse his position and authority.  Dkt. No. 1 ¶ 75.  Howard further alleges that as a result of defendants failing to insure that Deputy Tanabe was fit for duty, Howard was injured from being placed in a position of witnessing Deputy Tanabe commit a crime.  *Id.* ¶¶ 76-77, 81.  In connection with the seventh claim, the complaint alleges that the County and Sheriff Livingston "negligently, carelessly, recklessly, and/or with a reckless disregard" employed and supervised defendant Fawell and "assigned [him] to duties which enabled [him] to harass and retaliate against persons who report crimes of other law enforcement officers, proximately causing severe injuries to Plaintiff."  *Id.* ¶ 91.  Howard also alleges a claim for intentional infliction of emotional distress against the County, Livingston, and Fawell, asserting that the conduct described in the complaint was outrageous, and done with the intent of causing, or with reckless disregard to the probability of causing, severe emotional distress, and did actually cause Howard to suffer humiliation, mental anguish, and emotional and physical distress.  *Id.* ¶ 97.

Defendants move to dismiss the negligent hiring and IIED claims on the basis that workers' compensation is the exclusive remedy for injuries arising out of and in the course of the employment relationship.  Dkt. No. 12 at 30:1-31:5; citing Cal. Lab. Code §§ 3600, 3602; *Jones v. Dep't of Corr. and Rehab.*, 152 Cal. App. 4th 1367, 1384 (2007).  "When the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code by characterizing the employer's decisions as manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability."  *Cole v. Air Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 160 (1987); *see Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.*, 14 Cal. App. 4th 1595, 1605-06 (1993) (claim against employer for negligent supervision in connection with alleged sexual harassment and wrongful termination of employee is barred by workers' compensation exclusivity principle); *but see Greenfield v. Am. W. Airlines, Inc.*, No. 03-cv-05183 MHP, 2004 WL 2600135, at *7-8 (N.D. Cal. Nov. 16, 2004) (describing *Coit* as an

anomaly and holding that plaintiff's claim of negligent supervision related to the same set of facts alleged in sexual harassment claim was outside the normal scope of employment and thus not within the exclusivity of the workers' compensation system); *Jefferson v. Kellogg Sales Co.*, No. 08-cv-04132 SI, 2008 WL 4862511, at *3 (N.D. Cal. Nov. 11, 2008) (negligent supervision claim was based on racially discriminatory acts by employer that were contrary to public policy and thus fell outside the exclusivity provisions of the Workers' Compensation Act).

The California Supreme Court has described "a tripartite system for classifying injuries arising in the course of employment." *Fermino v. Fedco, Inc.*, 7 Cal. 4th 701, 713-715 (1994): (1) "injuries caused by employer negligence or without employer fault that are compensated at the normal rate under the workers' compensation system"; (2) "injuries caused by ordinary employer conduct that intentionally, knowingly or recklessly harms an employee, for which the employee may be entitled to extra compensation under section 4553"; and (3) "there are certain types of intentional employer conduct which bring the employer beyond the boundaries of the compensation bargain, for which a civil action may be brought." *Id.*

A number of cases have found exceptions to this general rule of preemption. *Grotz v. Kaiser Found. Hospitals*, No. 12-cv-3539 EMC, 2012 WL 5350254, at *10 (N.D. Cal. Oct. 29, 2012); *see, e.g.*, *Maynard v. City of San Jose*, 37 F.3d 1396, 1405-06 (9th Cir. 1994) (holding that state law claims for intentional and negligent infliction of emotional distress based on alleged retaliation for plaintiff's assistance of a black person and for his reporting of perceived irregularities in the purchase of communications equipment arose out of conduct that implicates fundamental public policies, and were thus not preempted by the Workers' Compensation Act).

The California Supreme Court has recognized that there are exceptions to the preemption rule for "conduct that 'contravenes fundamental public policy'. . . [and] conduct that 'exceeds the risks inherent in the employment relationship.'" *Miklosy v. Regents of Univ. of Cal.*, 44 Cal. 4th 876, 902 (2008) (citing *Livitsanos v. Superior Court*, 2 Cal. 4th

744, 754 (1992)).  In *Miklosy*, however, the Court clarified that the "exception for conduct that 'contravenes fundamental public policy' is aimed at permitting a *Tameny* action to proceed despite the workers' compensation exclusive remedy rule.  *Id.* at 902-03.  With respect to the second exception, the Court rejected the argument that whistleblower retaliation is not a risk inherent in the employment relationship, citing *Shoemaker v. Myers*, 52 Cal. 3d 1, 9 (1990).  *Miklosy*, 44 Cal. 4th at 903.  The Court held that the alleged wrongful conduct "occurred at the worksite, in the normal course of the employer-employee relationship" and that workers' compensation was thus the exclusive remedy for a claim despite incorporating allegations of whistleblower retaliation.  *Id.* at 902; *see also Ferretti v. Pfizer Inc.*, No. 11-cv-04486, 2012 WL 3638541, *11-12 (N.D. Cal. Aug. 22, 2012) (plaintiff's IIED claim that she suffered severe emotional distress after she was "subjected to harassment, retaliation, threats, and termination for reporting what she in good faith believed to be unlawful and unethical conduct by Defendant" did not qualify under either exception to the preemption rule).

Here, Howard argues that the harassment and retaliation defendants allegedly directed at him exceed the normal risk of the employment relationship.  Dkt. No. 23 at 28:22-25. Howard further asserts that he "was a whistleblower and reported a serious matter of public concern only to be harassed, retaliated against, and mocked for standing-up for the rights and the best interests of the public."  *Id.*  In support of his position, Howard cites to *Cabesuela v. Browning–Ferris Indus. of Cal., Inc.*, 68 Cal. App. 4th 101 (1998).  Dkt. No. 23 at 28:15-21.  In *Cabesuela*, the court found that a plaintiff's IIED claim, for being terminated for raising health and safety concerns related to working hours, was "premised upon his employer's violation of a fundamental public policy" and was thus not preempted by the Workers' Compensation Act.  *Id.* at 112.  However, as explained by the Court in *Ferretti*, plaintiff's reliance on *Cabesuela* is misplaced as it was effectively overruled by the California Supreme Court in *Miklosy*, which held that an IIED claim is preempted even where it is based on conduct that violates a fundamental public policy.  *Ferretti*, 2012 WL 3638541, at *11-12.  Howard has not provided any authority supporting the proposition that

Case No. 13-cv-03626 NC
ORDER ON MOTION TO DISMISS          35

the defendants' alleged negligent acts of hiring, which placed Howard in a position to witness a crime and be harassed and retaliated against for reporting the crime, exceed the risk inherent in the employment relationship.  Accordingly, the fifth and seventh claims for negligent hiring and the eighth claim for IIED are dismissed with leave to amend.

### 2.   Howard's Claim for Negligent Hiring of Deputy Tanabe (Fifth) Is Not Barred by the Fireman's Rule.

Defendants argue that the fifth claim for negligent hiring, supervision, and retention of Deputy Tanabe should also be dismissed because it is barred by the "Fireman's Rule." Dkt. Nos. 12 at 32:1-13; 26 at 9:11-18.  This argument is not persuasive.

Under the California common law doctrine known as the "Fireman's Rule," "[o]ne who negligently causes the event to which a police officer responds owes no duty of care with respect to the initial negligent act." *Calatayud v. State of California*, 18 Cal. 4th 1057, 1059 (1998) (citing *Walters v. Sloan*, 20 Cal. 3d 199, 202 (1977)).  "The undergirding legal principle of the rule is assumption of the risk, i.e., the legal conclusion that the person who starts a fire owes no duty of care to the firefighter who is called to respond to the fire." *Id.* at 1061 (internal quotation marks and citations omitted).  The rule is also grounded in considerations of public policy in that "it is the fireman's business to deal with that very hazard [the fire] and hence, perhaps by analogy to the contractor engaged as an expert to remedy dangerous situations, he cannot complain of negligence in the creation of the very occasion for his engagement." *Id.* at 1061-62 (internal quotation marks and citations omitted).

Here, the Court cannot conclude that defendants' alleged negligence of hiring, retention, and supervision resulting in Deputy Tanabe's criminal conduct was the very hazard to which Howard was engaged and paid to respond.  Defendants have not cited to any case in which a firefighter or police officer was found to have assumed the risk of corrupt or criminal behavior by fellow firefighters or officers.  The Court declines to hold that the "Fireman's Rule" bars Howard's claim for negligent hiring of Deputy Tanabe.

//

### 3.   Howard Has Sufficiently Alleged Outrageous Conduct as Required to State a Claim for IIED (Eighth).

Defendants also contend that the IIED claim should be dismissed because Howard has not alleged conduct on the part of defendants that could conceivably be construed as extreme and outrageous, and that the allegations that defendants were rude and unfriendly to him are not sufficient.  Dkt. Nos. 12 at 31 at 6-26; 26 at 10:24-11:6.

"Ordinarily mere insulting language, without more, does not constitute outrageous conduct."  However, behavior may be considered outrageous if "a defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress."  *Cole*, 43 Cal. 3d at 155.

In his opposition, Howard responds that he endured more than mere insults or rude behavior.  Dkt. No. 23 at 29:14-20.  Howard alleges that he was intentionally ostracized and criticized, and systematically subjected to hostile behavior from his fellow deputies for telling the truth about Deputy Tanabe.  *See* Dkt. No. 1 ¶ 29 (criticized by his peers for trying to ruin the career of a respected and well-liked sheriff deputy, and not being allowed to talk about the events to explain the truth); *id.* ¶ 32 (treated with hostility by deputy); *id.* ¶ 34 (not told the purpose of meeting with the Assistant Sheriff and instead was escorted from his home to the meeting by a lieutenant in full uniform and in a marked vehicle, left standing outside the office for fifty minutes, told by the Assistant Sheriff "if you were a regular, I would have fired your ass" and several more statements similar to this); *id.* ¶ 35 (treated with hostility by lieutenant); *id.* ¶ 37 (approached by the Assistant Sheriff at the Sheriff's Annual BBQ who accused him of having a lack of team spirit and of having a borderline disrespectful demeanor, and was told the Assistant Sheriff was "keeping an eye on" him); *id.* ¶ 39 (treated with hostility and derogatory comments from deputies at the Court Security division of the County Sheriff's Office); *id.* ¶ 40 (similar types of harassment from other deputies within the County Sheriff's Office throughout the next

several months); *id.* ¶ 41 (when complaining about the harassment and retaliation being told by the Sheriff he should consider himself "lucky" that he had not been dismissed, that he was "too sensitive" and "needed to grow thicker skin").

Drawing the reasonable inferences in favor of Howard, the complaint alleges a sufficient factual basis to infer that defendants abused their position of authority over him and that their conduct was sufficiently outrageous to support an IIED claim. *See Faurie v. Berkeley Unified Sch. Dist.*, No. 08-cv-0060 TEH, 2008 WL 820682, at *11 (N.D. Cal. Mar. 26, 2008) (plaintiff stated a claim for IIED despite the fact that some of the acts complained of were part of personnel management activity, plaintiff also alleged an ongoing course of humiliation and harassment, and that the conduct was an abuse of a relationship in which the defendants had authority over him); *Vierria v. Cal. Highway Patrol*, 644 F. Supp. 2d 1219, 1247 (E.D. Cal. 2009) (plaintiff sufficiently alleged extreme and outrageous conduct by alleging that defendants abused their position by conspiring to use their authority and control of the workers' compensation system to intimidate, embarrass and humiliate plaintiff by "bringing false or exaggerated disciplinary charges against [her for] not cooperat[ing] in the fraud"; taking advantage of her mental distress caused by her PTSD, by subjecting her to another "sham investigation" after four physicians agreed that Vierria's physical and emotional symptoms were caused by work-related stressors and approved three months leave).

Accordingly, defendants' motion to dismiss the IIED claim on the basis that it does not allege conduct that is sufficiently outrageous is denied.

**F.    Defendants' Motion to Dismiss Howard's Bane Act Claim (Sixth) Is Granted.**

Howard's sixth cause of action is under California Civil Code § 52.1, for violation of his right to free speech, due process, to be free from arbitrary action of the government and conduct from an officer that is deliberately indifferent and shocks the conscience, and the right to be free from retaliation under California Labor Code § 1102.5. Dkt. No. 1 ¶ 85. California Civil Code § 52. 1, known popularly as the Bane Act, creates a cause of action for "any individual whose exercise or enjoyment of rights secured by the Constitution or

laws of the United States, or . . . of this state, has been interfered with, or attempted to be interfered with" by any other person through "threats, intimidation, or coercion." Cal. Civ. Code § 52.1(a)-(b).

Defendants move to dismiss the Bane Act claim on two grounds. First, they claim that because Howard's rights under the First Amendment were not violated, he has no claim under § 52.1. Dkt. No. 12 at 32:17-23. However, because the Court denies defendants' motion to dismiss Howard's § 1983 claim based on alleged violation of the First Amendment, defendants' motion to dismiss his § 52.1 claim on this ground is likewise denied.

Additionally, defendants argue that the § 52.1 claim should be dismissed because Howard has not alleged that he was subjected to threats of violence against him. Dkt. Nos. 12 at 32:24-33:7; 26 at 11:8-19. Section 52.1 requires "an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Richardson v. City of Antioch*, 722 F. Supp. 2d 1133, 1147 (N.D. Cal. 2010) (citing *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998)). "The test is whether a reasonable person, standing in the shoes of the plaintiff, would have been intimidated by the actions of the defendants and have perceived a threat of violence." *Id.* (citations omitted). "A 'threat' under this section means 'an expression of an intent to inflict evil, injury, or damage to another.'" *Cuviello v. Expo*, No. 11-cv-2456, 2013 WL 3931650, *21 (E.D. Cal. 2013) (citation omitted); *In re M.S.*, 10 Cal. 4th 698, 710 (1995).

In his opposition, Howard does not dispute that to state an action under the Bane Act based on speech alone, he must show that the speech threatened violence against him and he reasonably feared that violence will be directed against him. Dkt. No. 23 at 30:17-31:1; Cal. Civ. Code § 52.1(j). Instead, he argues that by the nature of his job for a police agency, "working with dangerous weapons and apprehending violent criminals," he reasonably feared and experienced isolation and resentment from his co-workers that could have seriously jeopardized his safety. Dkt. No. 23 at 31:2-6. However, Howard does not cite to any case supporting this theory of liability. Even viewing the complaint in the light most

favorable to Howard, defendants' alleged speech does not express an intent to subject him to violence.  Therefore, the Bane Act claim is dismissed with leave to amend.

## IV. CONCLUSION

The Court grants in part and denies in part defendants' motion to dismiss the complaint as follows:

1. Defendants' motion to dismiss Howard's 42 U.S.C. § 1983 claims (first and third) is granted in part and denied in part.

   a. The request to dismiss Howard's claim under 42 U.S.C. § 1983 for violation of the First Amendment is denied.

   b. Howard's claim under 42 U.S.C. § 1983 for violation of due process is dismissed with leave to amend.

   c. Howard's claim under 42 U.S.C. § 1983 against defendant Fawell in his official capacity is dismissed without prejudice.

   d. Howard's claim under 42 U.S.C. § 1983 against defendant Fawell in his individual capacity is dismissed with leave to amend.

2. Defendants' motion to dismiss Howard's 42 U.S.C. § 1983 claim (second) is granted and the claim is dismissed with leave to amend.

3. Defendants' motion to dismiss Howard's 42 U.S.C. § 1983 claim against defendant Simpkins is granted.

   a. Howard's claim under 42 U.S.C. § 1983 against defendant Simpkins in his official capacity is dismissed without prejudice.

   b. Howard's claim under 42 U.S.C. § 1983 against defendant Simpkins in his individual capacity is dismissed with leave to amend.

4. Defendants' motion to dismiss Howard's claim for retaliation in violation of California Labor Code § 1102.5(b) (fourth) is denied.

5. Defendants' motion to dismiss Howard's claims for negligent hiring (fifth and seventh) and IIED (eighth) is granted and the claims are dismissed with leave to amend.

1    6.    Defendants' motion to dismiss Howard's Bane Act Claim (sixth) is granted

2         and the claim is dismissed with leave to amend.

3    Howard has until March 26, 2014, to file an amended complaint in accordance with

4    this order.

5    IT IS SO ORDERED.

6    Date: February 28, 2014

7                                         Nathanael M. Cousins
                                         United States Magistrate Judge